UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DONALD ROUNDS a/k/a Dollar,

                                    Defendant.

**REPORT AND
RECOMMENDATION**

10-CR-239S

## I.  INTRODUCTION

Defendant Donald Rounds ("Rounds") had permission from the owner of a
house to use the house and to spend nights there.  Rounds went ahead and did
just that, placing a mattress and clothing in the house's second-floor apartment
and locking the door to that apartment.  Did Rounds establish a subjective
expectation of privacy in the apartment, even if the house were dilapidated?
Standing to challenge a search and seizure also requires an objective
expectation of privacy based on what society generally would consider
reasonable.  What happens to Rounds's standing if the City of Buffalo had
declared the house in question uninhabitable and had told Rounds not to live
there?  Can Rounds establish an objective expectation of privacy in spite of a
municipal directive to the contrary?

Rounds's composite motion to suppress (Dkt. Nos. 222, 230, 430) requires
the Court to answer the above questions for a search and seizure that happened
on October 29, 2009.  Rounds believes that he does have standing to challenge

the search and seizure, which then would prompt the Court to look into the substance of the search and seizure. Rounds believes that he has standing because he had the owner's permission to use the house in question, he actually was using the house including for overnight stays, and the City of Buffalo effectively let him use the house after it found him there. The Government challenges Rounds's standing. According to the Government, the owner's permission does not matter where the house in question is so dilapidated that even a subjective expectation of privacy would be unreasonable. The Government also believes that an objective expectation of privacy is not possible here because the City had declared the house uninhabitable and had told Rounds that he could not live at the house lawfully.

The Court held a hearing on July 9, 2015 to supplement its prior hearing of December 20, 2011. For the reasons below, the Court respectfully recommends denying Rounds's motion for lack of standing.

## II. BACKGROUND

For the sake of brevity, the Court will presume general familiarity with the case. The Court instead will focus on the facts that affect the questions presented now, as gathered from the December 20, 2011 and July 9, 2015 hearings.

The questions presented concern events that occurred on October 29, 2009 at a two-story house located at 218 Townsend Street in the City of Buffalo

(the "Property").  On or before that day, law enforcement agents received information suggesting that a murder suspect (and eventual co-defendant in this case) named Adrian Traylor ("Adrian") was staying at the Property.  The exact nature of the information, exactly why agents thought that Adrian was staying at the Property, or what "staying" meant in terms of permanency, all are unknown.  The Government has not argued exigent circumstances, and the agents did not have a warrant for Adrian.  At the time, agents did not know that Raynard Traylor ("Raynard") owned the Property.  Raynard is a cousin of Adrian and Rounds's third cousin.

Upon receiving the information about Adrian, law enforcement agents including Buffalo Police Detective William Cooley ("Cooley") arrived at the Property at approximately 1:30 PM on October 29, 2009.  Cooley had never visited the Property before.  Although Cooley went to the Property because Adrian might be staying there, he "was a bit deflated" (Dkt. No. 545 at 102) when he arrived because the Property appeared vacant to him, which would mean that the information about Adrian was inaccurate.  Cooley believed that the Property was vacant, abandoned, or condemned for several reasons.  Cooley observed that all first-floor windows and the front door were boarded up with plywood.  Plywood at the front of the Property had a spray-painted house number; Cooley interpreted that marking as a sign from the City that the property was vacant.  Plywood at the front of the Property also had spray paint markings indicating that

utilities were cut off. Nonetheless, Cooley and other agents went around the Property and found a side door that was not boarded up and that was "functioning." "When you say 'functioning,' it wasn't functioning in perfect order, but an individual with a little effort could get in through that door . . . . we were able to open the door and get upstairs if that's what you're asking me." (*Id.* at 104.)

The next series of events unfolded once Cooley and the other agents entered the Property. Cooley proceeded into the Property and went up a staircase to the second floor. A locked door barred further entry. The door did not appear well-functioning from the outside but at least had a functioning lock on the inside. In fact, the door had an exterior handle missing, and through the hole where the handle would have been, Cooley looked inside and saw a man in the kitchen area of the second-floor apartment. At that point, Cooley did not know who the man was. Cooley demanded that the man open the door, and the man complied. As he and the other agents immediately entered the apartment, Cooley asked the man who he was and why he was there. The man identified himself as Rounds and stated that the owner of the Property, his cousin, had given him permission to stay there. Rounds explained to Cooley that he had been staying there for a while. Cooley observed a mattress on the living room floor and clothing near the mattress. Cooley saw no other furniture in the living room. As Cooley and the agents went through the apartment looking for Adrian,

they found a shotgun in the living room about four or five feet from the mattress. In the kitchen, agents found a quantity of crack cocaine and a scale on the countertop. Some paraphernalia such as drug packaging also might have been found in the apartment. Cooley and the agents promptly arrested Rounds; the exact reason in the agents' heads at the moment of arrest is not clear from the record. (*Compare id.* at 95 ("Q. Okay. Sir, eventually Mr. Rounds was arrested inside that apartment? A. Yes. Q. And was he charged with, among other things, trespassing? A. Yes. Q. And why was he charged with trespassing? A. Because he, by my investigation, didn't have any standing to be in that place as it was—appeared to be previously sealed off and boarded up by the City.") *with id.* at 112 ("Q. And you told us on your direct testimony that you arrested Mr. Rounds for trespassing, correct? A. I didn't lay the charges, but I was present when the other officers took him into custody and it's my understanding he was charged with criminal possession of a weapon, with some narcotics charges, and also trespassing.").)

When the events of October 29, 2009 unfolded, Cooley and the agents were not aware of the Property's history of inspection or housing violations from the City. (*Id.* at 102.) Thomas Brodfuehrer ("Brodfuehrer") from the City's Department of Permit and Inspection Services testified about the Property's history at the July 9, 2015 hearing. Going back as far as late 2003, the City logged several dozen inspector visits to the Property; the inspector remarks

primarily concerned new owners failing to register for a new or updated Certificate of Occupancy; the poor condition of the Property's exterior; or failure to cut grass or to clean up the yard at the Property. (*See generally* Dkt. No. 585 at 1–9.) Between 2006 and 2010, the City sent Raynard at least four written violation notices concerning the Property. (*See generally id.* at 11–20.) The City did not send Rounds any of these notices, nor did it send any of these notices to the Property itself. The only formal notice that Rounds would have received about the habitability of the Property would have come from Brodfuehrer himself. On January 22, 2008, Brodfuehrer visited the Property to observe the exterior. Brodfuehrer was surprised to find someone at the Property; the person who was there identified himself as "Donald" and as the owner's cousin. (*See* Dkt. No. 545 at 27–28.) "Donald" said that he was there to watch the building. Brodfuehrer told "Donald" that no one was allowed to reside in the house. Brodfuehrer said that because the City had not issued a new or updated Certificate of Occupancy, meaning that any occupancy would have violated the City Code and would have led to proceedings in Housing Court, including a request for an Order to Vacate. (*See id.* at 25, 29, 42.) Brodfuehrer did not enter the Property on January 22, 2008 beyond slight entry into the un-boarded side door; he did not enter the Property at all until July 13, 2011, long after the events relevant to this case. Brodfuehrer also took no steps to have Housing Court issue an Order to Vacate against "Donald." Even though Brodfuehrer did not

recognize Rounds at the hearing, the Court makes the factual inference that "Donald" from the January 22, 2008 event was Rounds.

The procedural history of this case set up the questions now presented that the Court needs to answer. Rounds had filed omnibus pretrial motions that included a motion to suppress statements that he made to Cooley and the other agents on October 29, 2009 as well as evidence found at the Property that day. (*See generally* Dkt. Nos. 222, 230.) After a hearing on December 20, 2011, this Court issued a Report and Recommendation on July 28, 2014 that, *inter alia*, recommended suppressing the statements and evidence. (Dkt. No. 375.) Judge Skretny set aside the portion of the Report and Recommendation concerning the statements to allow for further development of the questions now presented. (Dkt. No. 407.) Rounds subsequently filed a supplemental motion to dismiss on January 16, 2015. (Dkt. No. 430.) Rounds asserted that Cooley and the other agents had no legal basis to enter the Property on October 29, 2009 and could not claim good faith. Rounds attached an affidavit to his motion asserting standing to challenge the search and seizure; Rounds asserted specifically that Raynard gave him permission to use the Property. (Dkt. No. 430-1.) The Government, while criticizing Rounds's affidavit generally, does not specifically challenge whether Rounds had permission from Raynard. Rounds stated in his affidavit that Raynard asked him to watch the Property, and that he visited the Property on a regular basis while Raynard was incarcerated. (*Id.*) Rounds

7

stated further that he did spend nights at the Property with women and had a bed there. Notably, Rounds's affidavit also contains the assertion that "[t]he house was boarded up and *was the subject of inspections by the City of Buffalo.*" (*Id.* (emphasis added)) This assertion is notable because Brodfuehrer did not say anything about inspections to Rounds on January 22, 2008 and because, as mentioned above, the City never sent written notices about the Property either to Rounds or to the Property itself. Given that Rounds has asserted awareness of inspections to support his argument that he had standing on October 29, 2009, the Court infers that Rounds was at least generally aware of the Property's inspection and violation history as of October 29, 2009. The Court held a second hearing on July 9, 2015.

The parties recapitulated their positions in post-hearing briefing filed on August 19 and 24, 2015. (Dkt. Nos. 564, 570.) Rounds asserts that he was an overnight guest at the property with the permission of the owner, Raynard. Rounds argues that he had a reasonable expectation of privacy at the Property because he acted on the permission that he had and actually used the Property to sleep at the premises from time to time. Rounds points out that the presence of a mattress and men's clothing near the mattress, coupled with the locked door on the second floor, all support his contention that the Property was in use as a residence. As for the issue of abandonment, Rounds essentially makes a mixed argument of law and fact. Rounds argues, essentially as a matter of law, that

Cooley and the agents had no basis to deem the Property abandoned or vacant just because of how it looked. Rounds argues as a factual matter that Cooley and the agents saw indicia of residency and erred when they ignored those indicia. The Government challenges Rounds's standing to challenge the search and seizure of October 29, 2009. The Government argues that the physical condition of the Property coupled with the cutoff of utilities means that Rounds could not reasonably expect privacy there as he could at a more functional residence. The Government also emphasizes that Brodfuehrer told Rounds on January 22, 2008 that no one was allowed to live at the Property. The Government concludes that the lack of lawful authority to use the Property overrides whatever permission Rounds may have had from Raynard.

As stated in the Introduction above, Rounds's motion to suppress evidence from the events of October 29, 2009 requires two inquiries. Rounds will have to establish a subjective and objective expectation of privacy before the Court can proceed to the substance of the search and seizure.

## III. DISCUSSION
### A. Standing Generally

"It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *U.S. v. Padilla*, 508 U.S. 77, 81 (1993) (per curiam) (citations

omitted).  "The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. The movant must show that he had an expectation of privacy in the invaded place and that the expectation was legitimate, one that society is prepared to recognize as reasonable.  In evaluating these claims, the court generally considers whether the defendant had any property or possessory interest in the place searched or the items seized."  *U.S. v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991) (citations omitted).  A defendant's expectation of privacy must be active when a search occurs.  "Since one forfeits any reasonable expectation of privacy upon abandoning one's property, a warrantless search or seizure of abandoned property does not violate the fourth amendment.  Abandonment is a question of fact, to be decided in objective terms on the basis of all the relevant facts and circumstances, and not on the basis of leasehold interests or other property rights."  *U.S. v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987) (citations omitted).

### B. Rounds's Subjective Expectation of Privacy

As the first part of the standing analysis, the Court examines whether Rounds, in his own view, had an expectation of privacy in the Property.  Several factors support Rounds's argument that he did.  The Government essentially assumed *arguendo*, and thus did not explicitly challenge, that Rounds had permission from Raynard to use the Property.  The record contains at least two explicit instances when Rounds used the Property: the January 22, 2008

encounter with Brodfuehrer and the October 29, 2009 encounter with Cooley and

other law enforcement agents. Although furnishings on the second floor of the

Property appear to have been minimal at best, Rounds did have a mattress and

clothing in the second-floor apartment. Rounds has asserted that he stayed at

the Property overnight with women from time to time. Finally, although the door

to the second-floor apartment appears to have been in poor condition, the lock

on the door worked well enough that Rounds used it to secure himself inside.

Cooley and the agents could not enter the second-floor apartment unless

Rounds let them in, as he did, or unless they forced themselves in. Together,

these facts suffice to meet Rounds's burden that he created an expectation of

privacy for himself. Contrary to the Government's argument, the condition of the

Property by itself does not nullify the subjective factors for privacy that Rounds

has established. The record amply demonstrates that the Property was in bad

shape. The City had cut off utilities, and all but one window or entry point on the

first floor had been boarded up. The only entry point that was not boarded up,

the side door where Cooley and the agents entered, did not function very well.

Nonetheless, "[i]t is unreasonable to assume that a poorly maintained home is an

abandoned home . . . . There simply is no 'trashy house exception' to the warrant

requirement." *U.S. v. Harrison*, 689 F.3d 301, 311 (3d Cir. 2012). Brodfuehrer

undermined law enforcement agents' perception of the Property as abandoned

when he conceded on cross-examination that, with respect to City orders not to

occupy properties, the issuance of a directive and compliance with it are two different issues.  (*See, e.g.*, Dkt. No. 545 at 68 ("Q. You also don't know whether this person at this point in time, July 22nd, '08, was staying overnight on the second floor, correct?  A. I do not know that, correct.  Q. You know that the City's position would be that they shouldn't be, true?  A. That is true.  Q. But there's what should or shouldn't be and what sometimes happens; fair to say?  A. That is fair to say.").)  Brodfuehrer implied that occupancy of uninhabitable properties happens often enough that the agents would know that a house is not necessarily vacant just because the City says that it ought to be.

### C. Unlawful Occupation and the Objective Expectation of Privacy

Compared to the subjective expectation, Rounds has a considerably more difficult time establishing that society would deem reasonable the occupation of a property that a city declares uninhabitable.  Unlawful occupation of property runs contrary to societal standards of reasonableness.  *See U.S. v. Hunyady*, 409 F.3d 297, 302 (6th Cir. 2005) (finding no objective expectation of privacy where the defendant "was a trespasser under Michigan law at the time of the search in question"); *U.S. v. Ruckman*, 806 F.2d 1471, 1472–73 (10th Cir. 1986) ("Ruckman was admittedly a trespasser on federal lands and subject to immediate ejectment . . . . Ruckman's subjective expectation of privacy is not reasonable in light of the fact that he could be ousted by BLM authorities from the place he was occupying at any time."); *Amezquita v. Hernandez-Colon*, 518 F.2d

8, 11 (1st Cir. 1975) (finding no objective expectation of privacy where squatters occupied part of a farm owned by the Land Authority of the Commonwealth of Puerto Rico). Even where the unlawfulness in question does not rise to the level of criminal sanction, an expectation of privacy in a property becomes "severely diminished" when a city declares that property a nuisance. *See Freeman v. City of Dallas*, 242 F.3d 642, 652 (5th Cir. 2001) (en banc) ("Regulation of nuisance properties is at the heart of the municipal police power. It is eminently reasonable for a city to prescribe minimum property maintenance standards to protect the public and to maintain adjacent land values."); *cf. Jamison v. Angelo*, No. 4:10CV2843, 2012 WL 4434152, at *10 (N.D. Ohio Sept. 24, 2012) ("Here, plaintiffs were afforded notice and a hearing regarding the condemnation of their real properties. Plaintiffs failed to contest the condemnation determinations and were notified that the properties had been condemned and scheduled to be demolished."). The unlawfulness of an occupation of property is particularly inexcusable when the occupier is aware of the unlawfulness. *See Cross v. Mokwa*, 547 F.3d 890, 902 (8th Cir. 2008) (Bye, *J.*, dissenting in part) (suggesting that unawareness of a legal violation could mitigate an otherwise unlawful occupation).

Here, Rounds stayed in the Property contrary to City directives and knew it. Brodfuehrer told Rounds on January 22, 2008 that he was not allowed to be in the Property. As noted above, Rounds's own affidavit in support of standing

concedes that he had some awareness of inspections and violations concerning the Property.  Rounds had to have had this awareness by October 29, 2009; putting a later awareness in his affidavit would make no sense and would serve no purpose.  Rounds's awareness of violations dovetails with the absence of a new or updated Certificate of Occupancy for the Property.  *See* Buffalo, NY City Charter Ch. 129, § 129-1 ("No building hereafter erected shall be used or occupied in whole or in part until a certificate of occupancy shall have been issued by the Commissioner."), *available at* http://ecode360.com/13581851 (last visited September 2, 2015).  That Rounds has exposed a discrepancy between City housing policy and enforcement may or may not reflect poorly on the City, but it does not reflect on society at large.  In a conflict between the legal principle of a violation and the fact of an unenforced violation, society will not create an objective expectation of privacy by letting the former yield to the latter.  To hold otherwise would undermine the City's police power to control nuisance properties and would reward squatters and other unlawful occupants who don't get caught.  This is where Rounds's argument for standing fails.

Since Rounds lacks standing to challenge the search and seizure of October 29, 2009, the Court recommends that assessing other aspects of the search and seizure is unnecessary.

## IV. CONCLUSION

For all the foregoing reasons, the Court respectfully recommends denying Rounds's motion to suppress (Dkt. Nos. 222, 230, 430).

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); FRCP 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: September 2, 2015